**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> v. <br><br> **MICHAEL DAVIS JR.,** <br><br> **Defendant** | **CRIMINAL NO. ELH-20-009** |

### SUBMISSION IN SUPPORT OF DEFENDANT'S CONTINUED DETENTION

Defendant Michael Davis Jr. repeatedly and consistently sold drugs—crack, cocaine, heroin, and fentanyl—and firearms to a Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Confidential Informant (CI) during a series of controlled buys over a period of nearly five months. His proposed third-party custodian is not suitable inasmuch as she has past convictions for CDS manufacturing and possession with intent to distribute CDS, was present during at least one controlled buy of drugs from law enforcement, and cannot be trusted to honestly report a violation of any condition of release to the Court.

Having previously consented to detention, Defendant, who is housed at the Correctional Treatment Facility (CTF), now asks this Court for a detention hearing, ECF No. 16, presumably in light of his concerns about the COVID-19 pandemic.

There is a presumption of detention pursuant to 18 U.S.C. § 3142(e)(3)(A). Defendant poses a danger to the community. He is also a flight risk. Further, multiple judges in this District and the United States District Court for the District of Columbia recently have denied similar claims for detainees (such as Defendant) housed in facilities run by the D.C. Department of Corrections ("DOC"). *See United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209 (Order by Judge Grimm); *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (Order by

Magistrate Judge Sullivan); *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms); *United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake); *United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day); *United States v. Hill*, APM-19-260 (D.D.C.), Minute Order dated March 19, 2020.  The Court should thus continue to detain Defendant pending trial.

## BACKGROUND

On January 9, 2020, a Grand Jury sitting in the District of Maryland returned an indictment charging Defendant with one count of Conspiracy to Distribute and Posses With Intent to Distribute Controlled Substances (cocaine base), in violation of 21 U.S.C. §§ 846, 841(a)(1) and two counts of Distribution of a Controlled Substances (cocaine base and fentanyl) in violation of 21 U.S.C. § 841(a)(1).

By way of background, law enforcement encountered this Defendant during an investigation into drug activity and violence in the Pigtown area of Baltimore City.  This investigation was prompted by heavy drug activity in the area of Pigtown, as well as shootings and homicides in the area too.

Beginning in the spring of 2019, the ATF placed an undercover Agent and a CI in the neighborhood who conducted numerous controlled buys of drugs and firearms from the Defendant and others.  Beginning on June 6, 2019 and continuing until October 30, 2019, the CI conducted more than 10 controlled buys from Defendant, purchasing (as confirmed by later obtained lab results) cocaine base, cocaine, heroin, and fentanyl from Defendant.  The CI also purchased five

firearms[1] from Davis Jr. during the period from June 2019 to October 2019.[2]  Many of these controlled purchases were audio and/or visually recorded by the CI, and the ATF UC Agent witnessed many of the buys too.

On January 14, 2020, Defendant had his initial appearance and consented to detention.  ECF No. 14.  On March 31, 2020, he filed the instant motion for review of detention order, presumably in light of concerns regarding COVID-19.  ECF No. 16.

## ARGUMENT

### I. The Section 3142(g) Factors Weigh Heavily in Favor of Detention

18 U.S.C. § 3142(g) provides that, in considering whether release conditions can be set, the Court should consider, among other things, "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).

Further, because of the nature of the charges against Defendant, the Government also is entitled to a presumption that no combination of release conditions will assure the safety of the community.  *See* 18 U.S.C. § 3142(e)(3)(A) (controlled substance offense with maximum penalty of ten years or more triggers rebuttable presumption of detention).

An examination of the § 3142 factors makes plain that the Court should continue to detain Defendant.

---

[1] Defendant's co-Defendant—who has not yet been arrested—was also involved with a number of the firearms sales.

[2] Defendant does not appear to be prohibited from possessing firearms.  But he is not licensed to sell them.

*First*, the nature and circumstances of the offenses are serious.  Over a period of nearly five months, Defendant repeatedly sold drugs—crack, cocaine, heroin, and fentanyl—to an ATF CI on over 10 occasions.  Further, on multiple occasions, he sold firearms to the ATF CI too: a revolver, a shotgun, and three semi-automatic pistols.

*Second*, regarding the weight of the evidence against Defendant, it is overwhelming.  He was repeatedly captured on audio and high quality video conducting the drug and firearm transactions—most of which were also witnessed by an ATF undercover Agent.

*Third*, regarding the history and characteristics of the defendant, it is true that Defendant has no criminal record.  But he does have a history of substance abuse, sporadic employment, as well as a handful of past drug-related arrests—all of which enhance the risks of danger and non-appearance.

*Fourth*, regarding the nature and seriousness of the danger to any person or the community that would be posed by the person's release, Defendant cannot be trusted to abide by any conditions of release.  Indeed, if he were placed on location monitoring, there is little to stop him from making the choice to engage in additional drug trafficking activity or simply deciding to flee.  If Defendant is released on conditions, there is also the very real likelihood that he will engage in obstructive conduct with his proposed third party custodian or others, including his co-Defendant who has not yet been arrested.

For instance, during one recorded jail call made in late February, Defendant and his proposed third party custodian apparently discuss the destruction of evidence.  The proposed third party custodian states that she cleaned the room and found what Defendant told her to look for.  She asks Defendant, "did you touch those things, cause, like, I ain't trying to cause no more problems."  Defendant says that he did and asked where she put them.  She responds nowhere.  Defendant then directs her to "throw them bitches in the woods."  She says, "I better wipe them off

and shit." Defendant then relays additional places she could put the items: "a sewer hole or anywhere" or a "park."

Moreover, Defendant's proposed third party custodian is unsuitable, further aggravating Defendant's risk of noncompliance with any conditions of release. Indeed, she has two past drug convictions herself—a conviction for CDS Manufacturing and a conviction for CDS PWID—and transported Defendant to the location of at least one controlled purchase in a car and drove him from the location after the purchase was complete.

In short, all of the § 3142 factors weigh in favor of Defendant's continued detention.

## II.   D.C. Department of Corrections Has Established Comprehensive Health Measures To Avoid A COVID-19 Outbreak

Although Defendant has not cited COVID-19 as the reason for seeking a detention hearing now, the timing of his submission suggests that the virus is the impetus for the request.

To be sure, the Bail Reform Act instructs courts to consider the "physical and mental health" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A). Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of Defendant's release.

Defendant, who is apparently in excellent physical health, does not allege that he has COVID-19 or even that he has been exposed to any individuals with COVID-19. Thus, Defendant is apparently not seeking release based on his *actual* "physical and mental health." Instead he relies solely on the *possibility* of becoming infected. As discussed below, however, DOC, which oversees the D.C. Jail and CTF, has implemented substantial precautionary measures to mitigate this risk.

### A.   Comprehensive Precautionary Measures Have Been Instituted to Avoid Transmission of COVID-19.

DOC has undertaken comprehensive precautionary measures to protect detainees from exposure to COVID-19.  As additional measures are implemented, DOC is alerting the public to the precautions.  *See* https://doc.dc.gov/page/coronavirus-prevention.  In addition to the information on the public webpage, the Government has learned the following by communicating with the United States Marshals Service ("USMS") and DOC's General Counsel.[3]

DOC has installed an "Incident Command System."  Each day, the heads of DOC and relevant agencies meet to discuss COVID-19 issues as they pertain to the D.C. jails, to discuss strategies to combat any possible spread of COVID through the D.C. jails, to track national trends, and to make sure DOC's policies are consistent with those national trends and with recommendations from the Centers for Disease Control and the D.C. Department of Health.

DOC also has taken various steps to protect its facilities, to screen visitors and incoming detainees at intake, to maintain cleanliness within the facilities, and to increase its medical coverage within facilities, including:

- **No Non-Legal Visitation:**  As of Saturday, March 14, 2020, DOC suspended all non-attorney in-person visits, programming, and volunteer activities, and has enhanced cleaning efforts, especially within common areas.  For staff and legal visitors, DOC performs a COVID-19 screening for these limited visitors.  The screening includes asking a series of questions to determine possible exposure to COVID, observing whether the person is displaying flu-like or COVID-associated symptoms, and taking their temperature.  Anyone displaying symptoms, giving a positive response, or showing an elevated temperature, is denied entry into the facility.

- **Inmate Screening and Awareness:**  All new detainees and inmates are subject to similar COVID-19 screening.  If an inmate presents with symptoms or provides affirmative answers during screening, they are provided a face mask and taken to medical.  Medical does an assessment and makes determination about whether transport to the hospital is appropriate.  Furthermore, facility staff are going through the jail units and reminding detainees to put in requests for sick call to see medical if they are feeling

---

[3] The Government is getting continual updates on the situation at D.C Jail and CTF.  Any discrepancies between this filing and prior filings, whether in this or other cases in this District, reflect additional or revised information obtained in the interim.  The Government recognizes that the situation is fluid and is trying to deliver the best information to the Court as we understand it at the time.

poorly.  Staff are reminded at roll calls about the need for various preventative measures.

- **Quarantine:**  Particular units have been set up to operate as quarantine locations.  Detainees are placed in quarantine locations if they show flu-like or COVID-like symptoms.

- **Extra Cleaning:**  Additional measures have been taken to maintain cleanliness of facilities, detainee hygiene, and access to (and awareness of) medical treatment.  DOC has increased its supply of cleaning and sanitation materials.  They currently have 55,000 bars of soap and are issuing inmates one bar of soap each week, in addition to allowing additional purchases of soap through commissary.  Posters are placed throughout the facilities to remind detainees about preventative measures they can take.  DOC staff puts emphasis on maintaining clean surfaces, avoiding touching, and other similar precautions.  In addition to standard cleaning, staff perform cleaning spot checks every two hours.  A cleaning unit goes through areas common areas to clean frequently touched areas like elevator buttons, escalators, and railings.

At the detention hearing, Defendant will undoubtedly direct the Court to the fact that (1) three DOC detainees have tested positive for COVID-19 (all of whom are currently in quarantine); and (2) a Deputy U.S. Marshal ("DUSM") in D.C. Superior Court who has tested positive for COVID-19.  This information does not merit Defendant's release.  *See Williams*, PWG-13-544 (acknowledging that DOC has taken significant measures to stem the tide of the pandemic, and recognizing that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly."); *United States v. Creek*, CCB-19-36, ECF No. 370 (Judge Blake denied motion for reconsideration seeking release of Defendant after positive test of detainee at CTF and where Defendant claimed that the individual who tested positive was in his unit).

With respect to the detainees who have tested positive, all are currently in isolation in DOC's infirmary. DOC's medical team is working closely with the D.C. Department of Health (DOH), in compliance with Centers for Disease Control guidelines. The housing units where each

resident was previously housed have been quarantined. The housing unit is also on restriction, limiting out of cell activity. When the residents leave their cells, they must wear surgical masks. DOC staff working in the unit must wear gloves and surgical masks. DOH is gathering the names of the staff and residents on the unit as part of its contact tracing investigation.

With respect to the DUSM, as of March 19, 2020, DOC is taking immediate, responsible action to address any potential threat. For example, DOC has identified DOC inmates and detainees who appear to have been in the vicinity of the DUSM and is screening those inmates and detainees for illness. Pending screening, those inmates and detainees have been separated from the rest of the DOC population. Likewise, USMS has taken steps to mitigate any risk from DOC and USMS personnel in the vicinity of the DUSM. Specifically, USMS sent home 95 deputies who had at least moderate contact with the DUSM in order to permit those individuals to self-quarantine; deputies from other jurisdictions were brought in to handle court matters.

### B. The Defendant's Individual Circumstances Do Not Merit Release.

Defendant, age 34, is apparently in excellent physical health. But even if he weren't, release on conditions would still not be warranted. Judges assessing motions for release based on COVID-19 have repeatedly denied them—even where a defendant was more vulnerable because of age or medical condition such as asthma. *See United States v. Williams*, PWG-13-544 (D. Md.), ECF No. 94 (Judge Day denied release for 67-year-old defendant); *United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209 (Judge Grimm denied motion for release from CDF where defendant suffered "diabetes, high blood pressure, asthma, and pain"); *United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Judge Blake denied motion for release from CTF where Defendant was asthmatic); *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (Judge Sullivan denied motion for release from CTF where Defendant was diabetic); *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Magistrate Judge Simms denied motion for release

from CTF where defendant had "suffered an aneurysm (in the past), had prostate cancer (now in remission), and presently suffers from diabetes, the latter two conditions having compromised his immune system and/or put him at a higher risk of an inability to fight infection")

While the COVID-19 virus is new, health claims by detainees are not. Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (unpublished). These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside. *United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999). Here, there is no reason to believe that Defendant's medical needs will not be met while he is detained.

### III.    Releasing Defendants Like Defendant Would Place An Undue Burden On The Pretrial Services Office And The Courts, Thereby Increasing Community Danger.

It is unclear at this time the specific conditions of release Defendant would have this Court set. But to the extent Defendant seeks the condition of 24/7 electronic monitoring, such a condition, in combination with other conditions, will not protect the public from Defendant. Further, awarding relief here, and in similar cases, would place a substantial and unwarranted burden on the Pretrial Services Division of the U.S. Probation Office, as well as the Court. Whenever the Court orders electronic monitoring, a Location Monitoring Specialist is appointed to oversee the defendant's pretrial release. To be sure, one case, by itself, would not strain the system. But if the Court released Defendant, then undoubtedly an avalanche of defendants would also seek release. Each defendant would make the generic argument that Defendant will undoubtedly advance here—that he should be released to reduce contact with other persons and have greater access to healthcare in the community.

At bottom, the prospect of a COVID-19 outbreak at CTF does not diminish the public interest in keeping Defendant off the streets. And if the Court did release Defendant, and other defendants, such release would not only endanger the community, it would quickly stretch the bandwidth of existing LM specialists beyond its breaking point.[4]

## CONCLUSION

For the foregoing reasons, the Court should order Defendant's continued detention pending trial.

                                        Respectfully submitted,

                                        Robert K. Hur
                                        United States Attorney

By:       /s/
            Paul A. Riley
            Lauren E. Perry
            Assistant United States Attorneys

---

[4] Before a defendant is placed on release, a Pretrial Services Officer also must vet the proposed residence and meet the proposed third-party custodian and other residents who live there. A flood of release orders would force these Officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection.