# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | * |
| | Case No.: ELH-20-09 |
| MICHAEL DAVIS, JR., | * |
| Defendant. | * |

* * * * * * * * * * * * * *

## MEMORANDUM OPINION

Pending before the Court is the government's motion for pretrial detention. For the reasons stated in this Memorandum Opinion and on the record, the motion is denied, and the defendant Michael Davis, Jr. ("Davis") is ordered released from U.S. Marshal's custody subject to the conditions set forth below and in the accompanying Order Setting Conditions of Release, ECF No. 20.

### Procedural History

On January 9, 2020, a grand jury sitting in this Court returned an indictment against Davis charging him with conspiracy to distribute and possess with intent to distribute a controlled dangerous substance, cocaine base, in violation of 21 U.S.C. § 846 (Count I); distribution of a controlled dangerous substance, cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Count II); and distribution of a controlled dangerous substance, fentanyl, in violation of 21 U.S.C. § 841(a)(1) (Count IV). ECF No. 1. The maximum penalty for each charge is 20 years' imprisonment. On January 14, 2020, Davis appeared in Court for his initial appearance and was appointed counsel. At the hearing, the government moved for his detention. A detention hearing was scheduled for January 16, 2020, and a temporary order of detention was entered. Davis ultimately consented to detention and no hearing was conducted. An Order of Detention by Agreement was entered "without prejudice to either side

requesting a prompt hearing to set appropriate conditions of release or otherwise address the detention of the defendant." ECF No. 14.

On March 21, 2020, Davis notified the Court that he now requests a detention hearing. ECF No. 16. He is entitled to a hearing under 18 U.S.C. § 3142(f). The hearing occurred on March 30, 2020.[1] No trial date has been set.

## The Bail Reform Act

Under the Bail Reform Act, the government may move for a defendant's pretrial detention if the case involves, among other offenses, "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.) . . . ." 18 U.S.C. § 3142(f)(1)(C). When a defendant is charged with such an offense, as is the case here, and the Court finds probable cause to believe the defendant committed the crime, there is a presumption, subject to rebuttal by the defendant, that "no combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3). The presumption of detention "places 'a limited burden of production—not a burden of persuasion' on the defendant to 'com[e] forward with evidence that he does not pose a danger to the community or a risk of flight.'" *United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) (quoting *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011)); *see United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010); *United States v. Moss*, 887 F.2d 333, 338 (1st Cir. 1989); *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986); *United States v. Portes,* 786 F.2d 758, 764 (7th Cir. 1985); *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). When the defendant meets his burden of production, it "remains a factor to be

---

[1] Davis, counsel, and the Pretrial Services Officer participated in the hearing by telephone. After consultation with counsel, Davis consented to the audio hearing. This procedure was authorized by Congress and has been adopted by this Court. *See In Re: Video Teleconferencing for Criminal Proceedings Under CARES Act*, Misc. No. 00-308, Standing Order 2020-06. These procedures are necessary to preserve the health and well-being of the participants in the hearing and the community. *See In Re: Court Operations Under the Exigent Circumstances Created by COVID-19*, Misc. No. 00-308 (Mar. 20, 2020).

considered among those weighed by the district court" but "does not eliminate the presumption favoring detention." *Khusanov*, 731 F. App'x at 21 (quoting *English*, 629 F.3d at 319). The government bears the burden of proving by a preponderance that no condition or combination of conditions will reasonably assure the defendant's appearance and by a clear and convincing showing that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(f); *see Khusanov*, 731 F. App'x at 21 (noting that the "ultimate burden" of proof remains on the government to "mak[e] a preponderance showing that the defendant poses a risk of flight and a clear and convincing showing that he presents a danger to persons or the community"); *Stone*, 608 F.3d at 945 ("As our sister circuits have found, section 3142(e)(3)'s presumption in favor of detention imposes only a 'burden of production' on the defendant, and the government retains the 'burden of persuasion.'") (citing *United States v. Mercedes,* 254 F.3d 433, 436 (2d Cir. 2001)); *Moss*, 887 F.2d at 338; *Suppa*, 799 F.2d at 119; *Portes,* 786 F.2d at 764; *Alatishe*, 768 F.2d at 371.

> The Bail Reform Act requires that the Court consider the following factors:
>
> (1)  the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2)  the weight of the evidence against the person;
>
> (3)  the history and characteristics of the person, including—
>
> > (A)  the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> >
> > (B)  whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4)  the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

3

18 U.S.C. § 3142(g).

If after a hearing, and upon consideration of these factors, the Court finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," then the Court "shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). Alternatively, if the Court finds that there are conditions or a combination of conditions that will reasonably assure the person's appearance and the safety of any other person and the community, the person may be released subject to certain conditions, including, among others, home confinement and third-party custodianship. 18 U.S.C. § 3142(c)(1).

The Supreme Court has held that pretrial detention is disfavored. *See United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."). In *Salerno*, the Supreme Court ultimately approved pretrial detention based on dangerousness, but the Court was clear that the Bail Reform Act is preventative, rather than punitive, in nature. *Id.* at 747–48. Consistent with the Supreme Court's holding, the Bail Reform Act states that nothing in it "shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. § 3142(j).

<u>Analysis of Bail Reform Act Factors</u>

Davis is 34 years old. He was born and raised in Baltimore, Maryland. Before his arrest, he was in regular contact with his mother, brother, two sisters, and four children, all of whom live in Baltimore. He does not possess a passport and has never traveled outside of the United States. At the time of his arrest, Davis was unemployed, but his most recent employment was as a roofing laborer. Before that, Davis was employed, through a temporary staffing agency, with a Baltimore County trash pickup service from approximately 2017 until 2018. Davis has performed various manual labor jobs, such as moving, hauling, and construction, since he was 18.

4

Davis has no prior criminal convictions. He has been arrested and charged with offenses on six prior occasions, but every prior charge has been dismissed. After these prior arrests, he was released by a court on his own recognizance four times and once on bond. There is no release information for the final arrest. Davis has no history of failing to appear for court.

Davis reported two months ago to Pretrial Services that he is in excellent physical health. He now reports that he has bronchitis. He appears to have significant mental health issues. His mother reported to the Pretrial Services Officer that her son exhibits symptoms of bipolar disorder and major depressive disorder. She said that she has been diagnosed with those mental health conditions, and she observes similar behavior in her son, including a short temper, headaches, lack of appetite, alcohol consumption, and marijuana use. Davis's mother also reported that he has a history of suicidal ideation and suicide attempts. As recently as October 2019, he threatened to commit suicide. He attempted suicide in 2017 and August 2019. Davis has a history of substance abuse. He reported that at the time of his arrest, he smoked marijuana three times a day and consumed alcohol weekly. He previously consumed ecstasy approximately once a month. According to his mother, Davis has never been hospitalized or participated in mental health treatment or substance abuse treatment. At the time of his arrest, Davis had been homeless for two years, staying with friends and family.

Davis has been charged with federal drug offenses. In the indictment, it is alleged that Davis conspired with his co-defendant to distribute cocaine base between August and October 2019. It is further alleged that on two occasions in the fall of 2019, Davis unlawfully distributed cocaine base and fentanyl. These charges are serious.

The government has proffered additional information about Davis's alleged criminal conduct. During the hearing and in its submission in support of continued detention, the government asserts that beginning in the spring of 2019, the ATF placed an undercover agent and a confidential informant (CI) in Baltimore's Pigtown neighborhood who conducted numerous controlled buys of drugs and

5

firearms from Davis and others. ECF No. 17 at 2. From June until October 2019, the government claims that the CI conducted more than 10 controlled buys from Davis, purchasing cocaine base, cocaine, heroin, and fentanyl from him. *Id.* It is further alleged that the CI purchased five firearms from Davis during this period. *Id.* at 2–3.

The weight of the evidence against Davis is strong. According to the government, Davis was repeatedly captured on audio and video conducting the drug and firearm transactions and most of them were also witnessed by an undercover agent. *Id.* at 4.

Davis argues that he should be released because of the COVID-19 public health emergency. The current public health crisis certainly factors into the decision to detain or release someone pending trial. *See United States v. Jefferson*, No. CCB-19-487, 2020 WL 1332011, at *1 (D. Md. Mar. 23, 2020); *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *3–4 (D. Md. Mar. 17, 2020). The Court finds that the COVID-19 public health emergency must be considered when weighing "the nature and seriousness of the danger to any person or the community that would be posed by the person's release" and the defendant's "physical and mental health." 18 U.S.C. § 3142(g)(3)(A) & (4).

In the midst of a public health crisis, the Court must rely largely on the expertise of the Centers for Disease Control and Prevention (CDC), public health officials, and medical professionals when it assesses "the danger to any person or the community that would be posed by the person's release." In that regard, the Court has been educated by a March 25, 2020 letter to Governor Hogan signed by over 200 public health experts, doctors, and nurses who teach at Johns Hopkins Bloomberg School of Public Health, School of Nursing, and School of Medicine expressing their "urgent concern about the spread of COVID-19 in Maryland's prisons, jails, and juvenile detention centers." *See* Mar. 25, 2020 Ltr. from Johns Hopkins Faculty to Gov. Hogan ("Hopkins Faculty Ltr."), *available at* https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf, attached to this Memorandum Opinion as Exhibit 1. These Hopkins faculty

6

members believe "an urgent priority in this time of national public health emergency [is] to reduce the number of persons in detention as quickly as possible." *Id.* They advise that reducing the number of detained persons in Maryland will make the community safer. The Court agrees.

In their words:

> This pandemic is shedding a bright light on the extent of the connection between all members of society: jails, prisons and other detention facilities are not separate, but are fully integrated with our community. As public health experts, we believe these steps are essential to support the health of incarcerated individuals, who are some of the most vulnerable people in our society; the vital personnel who work in prisons and jail; and all people in the state of Maryland. Our compassion for and treatment of these populations impact us all.

*Id.*

The CDC, the Hopkins faculty, and other public health officials are instructing us that social distancing is the only way to slow down the spread of COVID-19, to flatten the curve, and to avoid a strain on our scarce healthcare resources. Social distancing in a pretrial facility is nearly impossible for anyone who enters its doors, especially detainees. The inability to practice social distancing in jails makes "transmission of COVID-19 more likely." *Id.*[2]

The risk caused by the inability to social distance is exacerbated by the fact that pretrial detention facilities see a daily flow of people entering and leaving the facility who could be carrying the virus but are asymptomatic.[3] *See id.* (noting that "population mixing of staff and detainees also increases likelihoods of exposure" and "[t]his has led to prison outbreaks of COVID-19 in multiple

---

[2] *See also United States v. Harris*, No. 19-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The risk of the spread of the virus in the jail is palpable . . . ."); *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) ("The risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious."); *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) ("[I]t is not possible for a medically vulnerable inmate . . . to isolate himself in [an] institutional setting as recommended by the CDC.").

[3] The daily flow of human traffic includes correctional officers, kitchen workers, administrative staff, attorneys, and newly admitted pretrial detainees who were recently in the community or in another jail or prison.

7

detention facilities in China, associated with introduction into facilities by staff"); *United States v. Barkman*, No. 19-cr-52-RCJ-WGC, 2020 U.S. Dist. LEXIS 45628, at *3 (D. Nev. Mar. 17, 2020) ("Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.").

As of today, there are five detainees at the Correctional Treatment Facility (CTF), where Davis is detained, who have tested positive for COVID-19. It would be a welcome relief if the number stopped there, but that is unlikely. The first positive was reported last Wednesday, the second a day later, and three more over the weekend.[4] There is no evidence that Davis has been infected. He reported to Pretrial Services two months ago that he was in excellent health. He reports today that he has bronchitis. Other than bronchitis, he does not have any other apparent underlying health conditions that put him at greater risk of harm if he were exposed to the virus. The government argues that because he is in excellent health, this factor does not support release. ECF No. 17 at 5. The Court disagrees. If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical treatment if necessary. The Court finds that the "physical and mental health" factor cuts in favor of release for any defendant during this public health crisis. If Davis has bronchitis, this underlying health condition

---

[4] Governor Hogan announced yesterday that Maryland "will be looking more like New York" around Easter, which is less than two weeks away. If that is the case, the COVID-19 outbreak in New York City's jails should be considered, even if the comparisons are not perfect. During the week of March 15, the New York Department of Corrections reported 21 cases of COVID-19 in inmates. Today, about two weeks later, it has been reported that 167 New York City inmates and 114 city corrections staff members at Riker's Island have tested positive. Additionally, here in Maryland, the Clifton T. Perkins Hospital Center, Maryland's maximum-security state psychiatric hospital, reported today that several patients have tested positive for COVID-19, and the Maryland state prisons have reported their first case.

8

would raise his risk for greater harm if exposed, which in turn would make this factor even more compelling.[5]

Experts agree that pretrial detention facilities are poorly equipped to manage a crisis resulting from this potentially deadly, highly contagious novel coronavirus within their walls. By design, jails are not medical facilities. "[F]or incarcerated individuals who are infected or very sick, the ability properly to treat them and save their lives is very limited. Testing kits are in short supply, and prisons and jails have limited options for proper respiratory isolation." *See* Hopkins Faculty Ltr.[6] The spillover effect that an outbreak in a pretrial facility would have on the greater community is undeniable and concerning. *See id.* ("Prison, jail, and detention center staff may bring the virus into the facility and are also at risk of acquisition from infected incarcerated individuals. Once infected, staff may also transmit the virus back into the communities and to their families. As jail, prison, and detention center health care staff themselves get sick with COVID-19, workforce shortages will make it even more difficult to adequately address all the health care needs in facilities."). "The risk of overburdening the jail's healthcare resources, and the healthcare resources of the surrounding community is real." *United States v. Harris*, No. 19-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020).[7]

---

[5] Even if Davis were at a jail where there have not yet been reports of positive tests, the "danger to the community" analysis still would apply. Public health officials and experts have not advised us to wait until the virus is found in a facility before we act. Rather, they urge us to take preventative steps to avoid, stem, or curtail the crisis. The most important step we can take is to reduce the detainee population when possible, regardless of whether the virus has been detected in the facility.

[6] *Cf. United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("Though the BOP has admirably put transmission mitigation measures in place . . . in the event of an outbreak at the Metropolitan Correctional Center . . . substantial medical and security challenges would almost certainly arise.").

[7] The government argues that the pretrial detention facilities are equipped to handle the situation. The institutional efforts cited by the government include increased sanitation and hygiene, elimination of family visits, training of correctional officers, screening new inmates for symptoms, and quarantining inmates if necessary. ECF No. 17 at 5–7. These measures are important. However, they do not prevent the virus from entering the facilities, and they do not enable social distancing. Moreover, the Court agrees with the Hopkins experts that pretrial facilities are not equipped to provide the necessary medical care.

The Court finds that the presumption of detention as to dangerousness has been rebutted due to the COVID-19 health crisis. The "danger to the community" analysis, however, does not stop there. The Court must take into consideration whether Davis himself poses a danger to the community such that releasing him would be more dangerous than keeping him detained. *See United States v. McLean*, Crim. No. 19-380, slip op. at 4 (D.D.C. Mar. 28, 2020) ("Defendant's continued pretrial detention poses a risk to community safety, which the Court must weigh against the risk posed by his release to home confinement . . ."); *see also United States v. Stephens*, No. 15-cr-95-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("Although there is not yet a known outbreak [of COVID-19] among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop . . . A comprehensive view of the danger the Defendant poses to the community requires considering all factors—including this one—on a case-by-case basis.").

As evidence of Davis's danger to the community, the government points to his alleged drug dealing and his unlawful sale of firearms to a confidential informant over a six-month period last year. These are serious allegations, and the alleged conduct presents a danger to the community. However, rare is the case in which there will be no evidence of danger to the community based on alleged criminal conduct. The plain language of the statute requires the Court to evaluate the "nature and seriousness of the danger." This language makes clear that there are different types of dangers and varying levels of seriousness. Selling narcotics, for example, is different than identity theft, which is different than carjacking. Having identified the specific nature of the danger and how serious it is, the Court then must consider available release conditions that will address those concerns and "reasonably assure" the safety of the community. The statute requires "reasonable assurance," not a "guarantee." *United States v. Orta*, 760 F.2d 887, 891–92 (8th Cir. 1985). At times, there will be no such conditions. Here, there are.

Davis has no prior criminal convictions and no history of violence.  The government agrees that he did not engage in violent acts during the period of alleged criminal conduct.  The government's concerns about danger to the community if he were released – that he would return to dealing drugs and selling firearms unlawfully – can be addressed with release conditions.  With these conditions in mind, the Court finds that Davis's continued incarceration poses a greater risk to community safety than his release.  *See Harris*, 2020 WL 1482342, at *1 ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on these strict conditions."); *United States v. Jaffee*, Crim. No. 19-cr-88 (D.D.C. Mar. 26, 2020) (minute order concluding that release to home confinement on high intensity supervision was appropriate after considering "all of the factors specified in 18 U.S.C. 3142(g), and, in particular, the overall safety of the community" because "the Court is now convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement."); *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) (finding that Ramos's "continued detention poses a risk of danger to himself and others").

With respect to flight, the Court finds that the government has not shown by a preponderance that Davis poses a risk of non-appearance.  He has strong ties to Baltimore.  His entire family lives here.  He has lived here his entire life.  He does not have a passport and has never traveled out of the country.  When he has been ordered to appear in court on charges in the past, he has complied with the court's orders.  Additionally, the pandemic has significantly curtailed travel throughout the region, including through Governor Hogan's order today that all Marylanders stay at home, providing additional assurance that Davis would not leave the area even if he had the financial resources to do

11

so. *See Ramos*, 2020 WL 1478307, at *1 ("'[T]he court finds that the circumstances of the COVID-19 pandemic diminish the risk that Mr. Ramos will flee pending trial . . .'").

The Court has considered the arguments and proffers of counsel, the Pretrial Services Report, and the publicly available information about COVID-19. Having applied them to the factors in the Bail Reform Act, the Court finds that there are conditions that will reasonably assure Davis's appearance in court and the safety of the community. Davis must reside at his girlfriend's home in Baltimore. She will serve as his third-party custodian.[8] He is confined to the residence except for medical appointments, meetings with counsel, court appearances, and other activities specifically approved by the Court and as pre-approved by Pretrial Services. Davis also must comply with all directives from federal, state, or local government pertaining to public health, including COVID-19. Pretrial Services should monitor his compliance with home confinement through location monitoring technology it deems appropriate. Davis may not use any controlled dangerous substances or illegal narcotics; he must attend substance abuse and mental health evaluation and counseling, if deemed appropriate by Pretrial Services; and he must submit to drug testing. Every condition of release is identified in the Order Setting Conditions of Release, ECF No. 20. Defense counsel should review the release order with his client, have Davis and his third-party custodian sign it acknowledging the conditions and consequences of a failure to abide by them, and submit a signed copy to the Court as soon as practicable.

---

[8] At the hearing, the government raised concerns about the third-party custodian. The Court agrees that Davis's girlfriend is not an ideal custodian, but the Court finds her suitable under these circumstances. She is 33 years old, has two minor children, and lives in Baltimore. She works as a pizza delivery driver five nights a week. She is willing to have Davis live in her home and serve as a third-party custodian. She appeared at the detention hearing by telephone. She has a dated criminal history of drug charges when she was younger, but she completed drug treatment and has no recent charges. The Court finds that she is suitable, particularly in light of Davis's compliance with prior court-ordered conditions, lack of criminal history, and the location monitoring release condition.

Access to Counsel

The Bail Reform Act does not address the extent to which pretrial detention may interfere with the attorney-client relationship. In ordinary times, the Court would not address it either. But these are not ordinary times. The current public health crisis has upended the world as we know it. It has dramatically altered and limited our interactions with family, friends, co-workers, and members of our community. And it will similarly alter and limit a defendant's interaction with his attorney – especially if the defendant is detained pending trial.[9]

Because of COVID-19 concerns, CDF has eliminated contact meetings with counsel. Instead, counsel may meet with their clients in visitation booths traditionally used for non-contact family visits. In these booths, the defendant and his attorney are separated by plexiglass and must use a phone to communicate. CTF has not eliminated contact visits with counsel; attorneys are still permitted to meet with their clients in the attorney-client meeting rooms.

Both arrangements pose myriad challenges for the lawyer, the defendant, and the attorney-client relationship. As a general matter, attorneys may not want to enter any of the detention facilities out of fear for their and their family's health. They also may not want to risk unwittingly carrying the virus into the facilities and transmitting it to their clients, other detainees, or jail employees. Attorneys will be even more deterred from visiting a client now that five detainees at CTF have tested positive for COVID-19. For those attorneys who do venture into the facilities during this public health crisis, they do so at their own risk.

---

[9] Counsel for Davis did not raise the access to counsel issue as a basis for release. However, counsel in another matter before the Court today provided an email exchange from March 24 and 25 in which a CTF staff member told him that "due to the increase of legal call requests, there will be a delay in processing legal calls. Diligent efforts are being made to accommodate everyone's request under these circumstances. The case manager/supervisor cc'd on this email will contact you for scheduling. Please Note: In-person legal visits are still allowed and the most frequently used option . . . Thank you for your understanding as we all are adjusting to the concerns of COVID-19." No legal call has been scheduled.

If an attorney does not visit his client at the jail, his only means of communication is by telephone and U.S. mail. The various technological alternatives to in-person meetings that many of us have taken advantage of during this crisis – FaceTime and Zoom, for example – are unavailable to incarcerated people. Even if these means of communication were an available option, there is no substitute for a face-to-face, in-person, contact meeting between an attorney and his client.

The disruption to the attorney-client relationship caused by this public health crisis likely will have broader implications for the Court and the administration of justice. If attorneys cannot regularly have meaningful in-person meetings with their clients, regularly review discovery with them, or thoroughly advise them about the consequences of going to trial, the number of jury trials may increase. This will strain Court and prosecutorial resources and may result in unnecessarily longer prison sentences. The extent of the disruption of the attorney-client relationship and the strain on the Court depends on how long this crisis lasts and how many people are detained pending trial. Even though access to counsel is not a specified factor in the Bail Reform Act, the Court has considered it in its decision.

<u>Conclusion</u>

In conclusion, the Court finds that there is a combination of conditions that will reasonably assure Davis's appearance as required and the safety of the community. Those conditions are identified in the accompanying Order Setting Conditions of Release, ECF No. 20. The government's motion for pretrial detention is denied.

| | |
|---|---|
| March 30, 2020 | /S/ |
| Date | Deborah L. Boardman |
| | United States Magistrate Judge |

14